

FILED
RICHARD W. NAGEL
CLERK OF COURT

2016 AUG -2 PM 2:20

U.S. DISTRICT COURT
SOUTHERN DISTRICT OHIO
EAST DIV COLUMBUS

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

Simplifi Health Benefit
Management, LLC,

      Plaintiff,

      v.                                **Case No. 2:13–cv–714**

Cayman Islands National
Insurance Company,                  **Judge Michael H. Watson**
                                        **Magistrate Judge Deavers**

      Defendant.

### OPINION AND ORDER

This is a contract case, with both parties alleging material breaches on the part of the other. This matter is before the Court upon Plaintiff Simplifi Health Benefit Management, LLC's ("Plaintiff") Motion for Partial Summary Judgment ("Plaintiff's Motion"). ECF No. 53. Also before the Court is Defendant Cayman Islands National Insurance Company's ("Defendant") Motion for Partial Summary Judgment ("Defendant's Motion"). ECF No. 54. For the following reasons, the Court **GRANTS IN PART AND DENIES IN PART** Plaintiff's Motion and **DENIES** Defendant's Motion.

Defendant has also filed a motion for leave to amend its answer in order to add an affirmative defense ("Defendant's Motion to Amend"). ECF No. 77. For the following reasons, the Court **DENIES** Defendant's Motion to Amend.

# I.    BACKGROUND

Plaintiff entered into an Administrative Services Agreement ("ASA") with Defendant, pursuant to which Plaintiff agreed to provide third-party administration services for Defendant's ERISA plan—Plaintiff agreed to process, pay, and settle claims submitted by health care providers for services to Defendant's insured. Compl., ECF No. 2.  Plaintiff would invoice Defendant each month for services to be performed the following month—meaning, Defendant pre-paid Plaintiff's administrative fees every month.  The ASA commenced July 1, 2011 for an initial two-year term ending June 30, 2013.  *Id.* at 3.

## A. Defendant's alleged termination of the ASA

The ASA, unless properly terminated by March 1, 2013, would auto-renew for a one-year period ending in June 2014.  That section provides, among other things, that:

> Either Party may terminate this Agreement at the end of the Initial Term or any Renewal Term by giving written notice of intent to terminate to the other party at least one hundred twenty (120) days prior to the end of the Initial Term or any Renewal Term.

ASA § 9.2, ECF No. 2-1.

> Section 10.12 governs notices and states:

> Any notice or other communication permitted or required to be given under this Agreement shall be in writing and shall be (a) delivered in person, (b) mailed, by certified mail, return receipt requested, postage prepaid, (c) delivered by a commercial overnight courier, or (d) transmitted by facsimile, to the following . . . .

> Simplifi Health Benefit Management, LLC
> 250 Civic Center Drive, Suite 350
> Columbus, Ohio 43215

> Attention: Legal Department
> Facsimile No.: (614) 221-4294

*Id.* at § 10.12.

On February 6, 2013, Defendant's Chief Executive Officer, Lonny Tibbetts ("Tibbetts") attempted to terminate the ASA via an e-mail sent to Stoddard Lawrence ("Lawrence"), a member of Plaintiff's management.  Compl. 4, ECF No. 2.  The email purported to terminate the ASA as of May 31, 2013.  Later that day, Tibbetts sent another email to Lawrence stating that Defendant was "not terminating this contract with any prejudice, we are simply exercising our rights as per the contract." Tibbetts Dep., Ex. D, ECF No. 48-4.  Tibbetts testified that he sent the cancellation notice via email because, despite Section 10.12, that was how the parties ordinarily conducted business.  Tibbetts Dep. 130–31, ECF No. 48.

Lawrence responded to Tibbets the next day, February 7, 2013, informing him that Plaintiff did not accept the e-mail as notice of termination of the ASA because it did not constitute proper notice under Section 10.12 and because the initial term of the ASA ran until June 30, 2013, so a May 31, 2013 termination date was not permitted.  Tibbetts Dep., Ex. F, ECF No. 48-6.  Lawrence informed Tibbetts that, if Defendant wanted to terminate the ASA, it was required to send a formal written termination notice on or before March 1, 2013, when the ASA would auto-renew for another year.  *Id.*  Defendant never sent Plaintiff a written termination notice that complied with Section 10.12.

The next week, representatives from both Plaintiff and Defendant met in the Cayman Islands for a previously-scheduled meeting. The parties disagree about what happened at that meeting.

Plaintiff's representative Mary Dixon ("Dixon") testified that Tibbetts, when asked if Defendant intended to terminate the ASA, "talked and talked in circles." Dixon Dep. 78–79, ECF No. 50. Dixon claims that Tibbetts told her that Plaintiff "might have to do a claims RFP," or "might have to have some discussions with the board," and that Defendant would only choose a replacement administrator that "could exceed what you guys are doing." *Id.* Dixon reported back to her superiors that Tibbetts was "open to having additional conversations" but that, if the ASA were to continue, "it would take a lot to convince the board that we have everything in place and that our fees were in line with the services performed." Sonnen Dep., Ex. 27, ECF No. 49-3. Another employee of Plaintiff also met with Tibbetts and reported that Tibbetts "entertained the idea of going month to month." Lawrence Dep., ECF. No. 52-4.

In the months following the Cayman Islands meeting, Tibbetts still did not directly respond to Lawrence's February 7, 2013 email rejecting the notice of termination, nor did he provide formal notice of termination. Sonnen Dep. 138, ECF No. 49. Cynthia Sonnen ("Sonnen"), an employee of Plaintiff, testified that Plaintiff was confused about Defendant's intentions regarding the ASA because "during February, March, and April we kept asking when can we get together and talk? When can we get together? And [Tibbetts] never got together with us." *Id.* at 138–

39. Plaintiff interpreted Tibbetts' silence as further evidence that Defendant did not actually intend to cancel the ASA. Accordingly, when March 1, 2013 came and went without an update from Tibbetts, Plaintiff believed the ASA auto-renewed for another year.

On April 19, 2013, Tibbetts finally responded to Lawrence's February 7, 2013 email. Compl., ECF No. 2. He informed Lawrence that Defendant had not yet selected a replacement third-party administrator but would call Plaintiff when Defendant's selection was finalized. *Id.*

On May 29, 2013, Tibbetts e-mailed Lawrence stating "As per our conversation, we will retain [Plaintiff] through the terms of the contract with a scheduled end date of June 30, 2013." Tibbetts Dep., Ex. P, ECF No. 48-16.

At that point, however, Plaintiff informed Tibbetts that the ASA had automatically renewed for another year due to Defendant's failure to timely provide "required formal notice" of termination by March 1, 2013. *Id.* Therefore, Plaintiff stated that the ASA would remain in force until June 30, 2014. *Id.*

Tibbetts responded to Plaintiff, countering that he and Lawrence had "held discussions on this matter" and that "we all agreed to 'run out' the contract per the original scheduled date" of June 30, 2013. *Id.* He also testified that Lawrence told him that the February 6, 2013 email notice of termination was sufficien and that a formal letter would be "pretty much redundant." *Id.* at 137. Lawrence denied, however, having either of these conversations. Lawrence Dep. 106–07, 154–55, ECF No. 52.

Sometime later, Tibbetts met with another employee of Plaintiff, Andrew Tang. Tibbetts testified that they discussed the "run out" period for the ASA and agreed that Plaintiff would provide some month-to-month services during the transition, even though the ASA had terminated. Tibbetts Dep., 277–80, ECF No. 48. Andrew Tang, however, denied entering into this agreement or that it was "remotely close to anything that we talked about." Tang Dep. 188–89, ECF No. 51.

In June 2013, Plaintiff, maintaining that the ASA was still in effect, sent Defendant an invoice for services to be provided in July. Compl., ECF No. 2. Plaintiff alleged that Defendant appeared to be operating under this same belief—it told Plaintiff that it would require services through and beyond mid-July and continuously submitted service requests. *Id.* at 5–6.

Defendant, however, alleged that the ASA had terminated in June and thus refused to pay the invoice for services in July. Tibbetts Dep., Ex. E, ECF No. 48-23. Plaintiff suspended claim-processing services as of July 11, 2013 due to Defendant's failure to pay. *Id.* Sonnen testified that, in response, Tibbetts called and "told me I need to turn back on the systems that had been suspended and turned off" because "he needed those." Sonnen Dep. 141, ECF No. 49.

Plaintiff did not reestablish the claims-processing service, *id.*, but alleged that it nonetheless continued to serve Defendant in other ways and to incur expenses such as retaining staff to process Defendant's claims; performing client account and finance administration; account management and other client services functions; maintaining Defendant's data; supporting IT infrastructure; and paying third-party

vendors and subcontractors to receive, store, transmit, scrub, and process data files that Defendant continued to send to Plaintiff. Compl., ECF No. 2. Sonnen testified, for example, that Defendant continued to submit claims to Plaintiff though September 2013, although Plaintiff did not process them. Sonnen Dep. 252–53, ECF No. 68. She further testified that Plaintiff continued to maintain a website for Defendant, which allowed it to see online claims and print explanations of benefits, through July 10, 2013. *Id.* She also believed Defendant continued to call Plaintiff's employees to ask questions. *Id.*

### B. Plaintiff's allegedly deficient performance under the ASA

Defendant alleged in its counterclaims that Plaintiff's performance during the ASA's two-year initial term was nonconforming in material ways. ECF No. 27.

Specifically, Tibbetts testified that in February, March and April of 2012, Defendant pre-paid Plaintiff's fee invoices but Plaintiff did not provide any services in return. Tibbetts Dep. 248–49, ECF No. 48. Tibbetts alleged that Plaintiff "stopped processing claims" or, at least, did not timely pay claims because it was having trouble with its internal technology. *Id.* at 250. He further testified that Plaintiff was dishonest about the extent of the claims backlog and represented to Defendant that the claims were only delayed by a few days or weeks. *Id.* at 251–52. He believed, in reality, Plaintiff's performance under the ASA was delayed by over two months. *Id.* at 253.

Plaintiff, on the other hand, testified that it was converting its technology and, as a result, its system was down for only three weeks. Dixon Dep. 31, ECF No. 50.

Tibbetts sent Plaintiff an email threatening that, if Plaintiff did not resolve the backlog, he would declare it to be in breach of the ASA.  Tibbetts Dep. 255–56, ECF No. 48.  He testified that he never actually declared Plaintiff to be in breach, however, because "[t]hey came back to us and showed us a plan" to resolve the backlog, and he approved.  *Id.* at 256.  He acknowledged that Plaintiff accomplished the plan and "cleaned it up."  *Id.*

Tibbetts further testified that Plaintiff had breached the ASA by paying claims it was not authorized to pay.  *Id.* at 175.  He testified that, under the ASA, Plaintiff could only pay claims that were pre-approved by the designated care managed partner, an affiliate of the Mayo Clinic known as "MMSI."  Tibbetts Aff., ECF No. 63.  He alleged that Plaintiff, however, had "paid a total of $470,114.94 in claims which MMSI had denied[.]"  *Id.*

Tibbetts testified that he complained to Plaintiff about these unauthorized payments and, in response, Plaintiff prepared a report indicating that "in the long run or eventually" Defendant would have paid "460,000 of those.  20,000 they accepted as should never have been paid."  Tibbetts Dep. 177, ECF No. 48.  Defendant did not investigate this report or attempt to determine its accuracy at the time, but Tibbetts testified that it was in the processing of doing so now.  *Id.* at 177–80.

## II.    DEFENDANT'S MOTION TO AMEND ANSWER

Before reaching the parties' cross motions for summary judgment, the Court will address as a preliminary matter Defendant's Motion to Amend.  ECF No. 77.  Defendant moves for leave to amend its answer in order to add as an affirmative

defense "the absence of a real party in interest." Defendant argues that Plaintiff transferred to third-party America's Choice Healthplans, LLC ("ACH") all of its potential "after-tax monetary recoveries" from this case. *Id.* at 3. This, Defendant argues, makes ACH the real party in interest and its "failure to join or be substituted into this action" requires dismissal. *Id.* at 7. This is not the first time Defendant has made this argument to the Court. Defendant filed a prior motion to add or substitute ACH as a party in this case. ECF No. 64. This motion was denied by the Magistrate Judge. ECF No. 76.

Amendment of a party's pleading is controlled by Federal Rule of Civil Procedure 15(a), which provides that leave to amend a pleading "shall be freely given when justice so requires." However, a motion to amend may be denied if allowing the proposed amendment would be futile. *See Rose v. Hartford Underwriters Ins. Co.*, 203 F.3d 417, 420 (6th Cir. 2000). "A proposed amendment is futile if the amendment could not withstand a Rule 12(b)(6) motion to dismiss." *Id.* (citing *Thiokol Corp. v. Dep't of Treasury, State of Mich., Revenue Div.*, 987 F.2d 376, 382–83 (6th Cir. 1993)).

Defendant's proposed amendment would be futile in light of, and for all the reasons set forth in, the Magistrate Judge's order denying Defendant's prior motion to add ACH as a party in this case. Order, ECF No. 76. In that Order, the Magistrate Judge determined that ACH, which merely has a financial interest in the result of the litigation itself but not in the Plaintiff's underlying rights and claims, need not be added as a plaintiff. The Magistrate Judge noted that, while ACH may have

an interest in any litigation proceeds, "the cause of action in this case was specifically excluded from the transfer" from Plaintiff to ACH. *Id.* at 3–4. As a result, the Magistrate Judge held that Plaintiff's failure to add ACH as a party would not be grounds for dismissal. The Court agrees.

Therefore, Plaintiff is entitled to pursue this action on its own behalf and ACH need not be joined as a party. Defendant's proposed amendment adding a "real party in interest" affirmative defense would thus be futile and would only result in unnecessary complications and delay. Defendant's Motion to Amend is denied.

## III. STANDARD OF REVIEW

The standard governing summary judgment is set forth in Federal Rule of Civil Procedure 56(a), which provides: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must grant summary judgment if the opposing party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Van Gorder v. Grand Trunk W. R.R., Inc.*, 509 F.3d 265 (6th Cir. 2007).

When reviewing a summary judgment motion, the Court must draw all reasonable inferences in favor of the nonmoving party, who must set forth specific facts showing there is a genuine issue of material fact for trial, and the Court must refrain from making credibility determinations or weighing the evidence. *Pittman v.*

*Cuyahoga Cnty. Dept. of Children and Family Serv.*, 640 F.3d 716, 723 (6th Cir. 2011). Summary judgment will not lie if the dispute about a material fact is genuine, "that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 511 (6th Cir. 2009). Thus, the central issue is "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Pittman*, 640 F.3d at 723 (quoting *Anderson*, 477 U.S. at 251–52).

## IV. ANALYSIS

Both parties have filed motions for partial summary judgment. The Court will first address Defendant's motion for summary judgment as to Plaintiff's entire complaint. ECF No. 54. Then, the Court will address Plaintiff's motion for summary judgment as to Counts One and Four of Defendant's counterclaims. ECF No. 53.

### A. Defendant's Motion for Partial Summary Judgment

Plaintiff has brought three claims against Defendant: breach of contract, unjust enrichment, and recovery of attorney's fees. Compl., ECF No. 2. Defendant has moved for summary judgment as to all three claims. Def.'s Mot., ECF No. 54. The Court will address each of Plaintiff's claims, and Defendant's corresponding arguments, in turn.

#### 1. Count One: Plaintiff's breach of contract claim

Defendant moves for summary judgment as to Plaintiff's claim that it breached the ASA by failing to pay the invoice for July and for failing to honor the

one-year renewal period. Def.'s Mot., ECF No. 54. Defendant argues that the invoice was invalid because, as of June 30, 2013, the ASA terminated. The basis of Defendant's argument is that Tibbett's February 6, 2013 email to Lawrence was timely and sufficient notice of termination under Section 9.2. *Id.* Defendant further argues that Section 10.12, the ASA's formal notice provision, did not apply to termination notices and, even if it did, Defendant's failure to comply was harmless because Plaintiff received actual notice of the termination. *Id.*

Plaintiff responds that Defendant was required to comply with Section 10.12 and that genuine issues of fact exist as to whether Defendant provided Plaintiff with actual notice of its desire to terminate the ASA. Pl.'s Resp. 15, ECF No 61.

Both parties' arguments are correct in part. Plaintiff is correct that the notice procedure set forth in Section 10.12 clearly applied to any notice of termination. As Plaintiff points out in its motion, Sections 10.12 and 9.2 of the ASA can and should be read in harmony. *See Nature Conservancy, Inc. v. Sims*, 680 F.3d 672, 676 (6th Cir. 2012). Both provisions, read together, require Defendant's termination to be (1) in writing, (2) sent to Plaintiff's approved address, (3) via an approved method, (4) at least 120 days in advance. ASA, ECF No. 2-1. It is undisputed that Defendant did not comply with all of these conditions.

Defendant is correct, however, that strict compliance with Section 10.12 was not necessarily required. Under Ohio law, failure to comply with a contractual notice provision may be harmless if actual or constructive notice is nonetheless accomplished. *See, e.g., Triangle Props., Inc. v. Homewood Corp.*, 3 N.E.3d 241,

257–58 (Ohio Ct. App., 10th Dist. 2013) ("Even if written notice was required, this court has stated, [w]here there is evidence of actual notice, a technical deviation from a contractual notice requirement will not bar the action for breach of contract brought against a party that had actual notice."); *Gollihue v. Nat'l City Bank*, 969 N.E.2d 1233, 1238 (Ohio Ct. App., 10th Dist. 2011) ("Although courts generally should give effect to the plain meaning of the parties' unambiguously expressed intentions, in some circumstances courts will not strictly enforce contractual language requiring notice in writing.") ; *Daniel E. Terreri & Sons, Inc. v. Mahoning Cnty. Bd. of Comm'rs*, 786 N.E.2d 921, 932 (Ohio Ct. App., 7th Dist. 2003) ("The failure to follow the 'written notice' provisions of a construction contract can be construed as harmless if there is evidence of constructive or actual notice."); *Roger J. Au & Son, Inc. v. N.E. Ohio Reg'l Sewer Dist.*, 504 N.E.2d 1209, 1216–17 (Ohio Ct. App., 8th Dist. 1986) (recognizing "an abundance of case authority" that failure to abide by a notice requirement "may be harmless" if the other party nonetheless receives notice).

Therefore, even though Section 10.12 was applicable to Defendant's termination notice, Defendant's failure to comply with its requirements may have been harmless *if* Defendant otherwise provided Plaintiff with actual or constructive notice of its intended June 30, 2013 termination. The Court need not determine this legal issue now, however, because it cannot find as a matter of law that Defendant provided Plaintiff with such notice.

While Defendant argues that Plaintiff's actual notice of the June 30, 2013 termination is "undisputed" due to Tibbett's February 6, 2013 email to Lawrence, the record before the Court is not so clear-cut.  First, Defendant admits that, in the email to Lawrence, Tibbetts provided the wrong termination date.  Def.'s Mot., ECF No. 54.  He mistakenly indicated a May 2013 termination date rather than a June 2013 termination date.  *Id.*  Although that error may be immaterial on its own, Defendant compounded the confusion by following-up with another email stating that Defendant was "not terminating this contract with any prejudice."  Tibbetts Dep., Ex. D, ECF No. 48-4.  Further, Defendant did not respond to Plaintiff's request to clarify, even though Plaintiff explicitly stated that it was not interpreting the emails as terminating the ASA.  Sonnen Dep. 138, ECF No. 49.

Further, there is a dispute among the parties as to their in-person communication regarding the ASA.  At least one witness stated that the parties, a few days after Tibbetts sent the "termination" email, discussed the possibility of continuing the ASA.  Dixon Dep. 78–79, ECF No. 50.  Another witness stated that the parties discussed switching to month-to-month services—although it was unclear whether this arrangement would constitute an amendment to the ASA or a brand new agreement.  Lawrence Dep., ECF. No. 52-4.  And still another witness stated that the parties agreed that the ASA would terminate on June 30, 2013, but Plaintiff would nonetheless provide transitional services.  Tibbetts Dep., Ex. P, ECF No. 48-16.  There is also testimony that Defendant continued to demand services well past

June 30, 2013, perhaps under the ASA or perhaps not. Sonnen Dep. 141, ECF No. 49.

Accordingly, there is a genuine issue of material fact regarding whether Plaintiff had sufficient and unambiguous notice of Defendant's intention to terminate the ASA as of June 30, 2013. While the Court notes that Defendant's initial February 6, 2013 email is compelling evidence of notice, the Court cannot ignore the Plaintiff's contrary evidence. At this stage, the Court cannot weigh the parties' competing evidence or the credibility of conflicting testimony. This type of fact-finding is inappropriate on summary judgment. Accordingly, the Court denies Defendant's motion for summary judgment as to Count One.

### 2. Count Two: Plaintiff's unjust enrichment claim

Plaintiff alleged that, if the ASA were not in effect after June 30, 2013, Defendant was unjustly enriched by requesting and receiving Plaintiff's services after that date. Compl., ECF No. 2. Defendant moves for summary judgment on this tort claim, arguing that Plaintiff did not provided it with any services after June 30, 2013 or, at least, no services that can be "measur[ed] or quantif[ied]." Def.'s Mot. 18–19, ECF No. 54. Defendant also argues that, in bringing this claim, Plaintiff tacitly admitted that the ASA terminated on June 30, 2013 because "a plaintiff may not recover under a theory of unjust enrichment when an express contract covers the same subject." Def.'s Reply 10, ECF No. 68.

Defendant is correct insofar that, if Plaintiff establishes that a contract existed after June 2013, its unjust enrichment claim will be barred. "[U]njust enrichment and

breach of contract are mutually exclusive theories of recovery." *Booher Carpet Sales v. Erickson*, 1998 Ohio App. LEXIS 4643, at *14 (Ohio Ct. App., 2nd Dist. Oct. 2, 1998); *Teknol, Inc. v. Buechel*, No. 398416, 1999 U.S. Dist. LEXIS 22017, at *5–6 (S.D. Ohio Aug. 9, 1999) ("It is well-established that Ohio law does not permit recovery under the theory of unjust enrichment when an express contract covers the same subject.") (emphasis omitted).

At this point in the proceedings, however, judgment on that ground would be premature. Plaintiff is entitled to plead alternative claims of breach of contract and unjust enrichment, although it may only recover under one theory. *Teknol*, 1999 U.S. Dist. LEXIS 22017, at *8 ("Although it is clear that a plaintiff may not recover on his unjust enrichment claim when it is coextensive with his breach of contract claim, this Court concludes that a plaintiff may set forth both causes of action in his Complaint, as alternative theories, in accordance with Fed. R. Civ. P. 8(e)(2).").

Summary judgment on this claim is otherwise inappropriate because genuine issues of material fact must be resolved regarding the existence, nature, and value of services provided after June 30, 2013. As Defendant admits, Sonnen testified that Plaintiff continued to provide services to Defendant though at least July 10, 2013, including the maintenance of a website and answering Defendant's questions on the phone. Sonnen Dep. 252–53, ECF No. 68. Defendant has not offered evidence refuting this testimony and, instead, only argues that any services were worthless. Def.'s Mot., ECF No. 54. Therefore, there is at the very least a genuine

issue of material fact whether Plaintiff provided services to Defendant after June 30, 2013.

As to the value of the services, Plaintiff points to the ASA's monthly fee terms as evidence of the "market value." Pl.'s Resp. 21–22, ECF No. 61. Defendant counters that the ASA does not individually price-out these minor services and instead sets forth only "a lump sum for all services combined." Def.'s Reply 12, ECF No. 68 (emphasis in original). In other words, Defendant argues that Plaintiff will be unable to prove at trial that the fee set forth in the ASA, or some portion of it, is the proper measure of damages. This argument is not well taken. On summary judgment, it is immaterial whether Plaintiff's evidence or damage calculation will ultimately carry the day.

Accordingly, the Court denies Defendant's motion for summary judgment as to Count Two.

### 3. Count Three: Plaintiff's claim for attorney's fees

Plaintiff requests its attorney's fees, which are specifically provided for in the ASA in the event that a party is required to enforce the agreement through court intervention. Compl., ECF No. 2. Defendant moves for summary judgment on this claim, arguing that "because [Defendant] is entitled to summary judgment on Counts One and Two of the Complaint, [Plaintiff] is not the prevailing party and has no entitlement to an award of fees and costs." Def.'s Mot., ECF No. 54 (emphasis in original).

Count Three is dependent on whether or not Plaintiff prevails under its contract claim in Count One, which has yet to be determined. Accordingly, the Court denies Defendant's motion for summary judgment as to Count Three.

## B. Plaintiff's Motion for Partial Summary Judgment

Plaintiff has moved for summary judgment as to two of Defendant's counterclaims, Counts One and Four, both alleging that Plaintiff breached its obligations under the ASA. Pl.'s Mot., ECF No. 53.

### 1. Counterclaim Count One: Defendant's breach of contract claim for improperly-submitted invoices

Defendant counterclaimed, alleging that it pre-paid Plaintiff for administrative services "30 days before they were rendered" pursuant to a monthly invoice, but Plaintiff did not always adequately perform in return. Am. Counterclaims 2, ECF No. 27. Defendant alleged that Plaintiff "failed and refused to perform all of the claim review, processing, recording, and payment obligations" set forth in the ASA during March 2012 and "some portions of the months of February and April 2012." *Id.* Defendant demanded recoupment of $233,481.11 in fees paid for the periods "when [Plaintiff] did not provide" the services required and already paid-for under the ASA. *Id.*

Plaintiff moves for summary judgment on this counterclaim, arguing that the ASA bars Defendant's claim. Pl.'s Mot. 6, ECF No. 53. Specifically, Plaintiff argues that Section 6.5 of the ASA limits "retroactive adjustment" of fee invoices "to thirty days." *Id.* at 8. Section 6.5 of the ASA states in relevant part:

> If [Defendant] disputes an amount invoiced by [Plaintiff] based on anything other than eligibility, [Defendant] shall not adjust the amount invoiced by [Plaintiff], but shall promptly notify [Plaintiff] accordingly. . . . [Defendant] must notify [Plaintiff] of such a dispute within thirty (30) days following the date of invoice.

ASA Section 6.5, ECF No. 2-1. Therefore, Plaintiff argues, Defendant was required to seek any repayment within thirty days of receiving the fee invoice. Pl.'s Mot., ECF No. 53.

Defendant responds that Section 6.5 "[o]n its face . . . provides a mechanism to resolve disputes over billing matters" only, and does not apply to its counterclaim for breach of the ASA. Def.'s Resp. 5, ECF No. 62. In support, Defendant points to Section 8.3 of the ASA, which lists events of material breach and default: Under Section 8.3, Defendant could hold Plaintiff in default if it "commit[ed] a breach of any material obligation or express warranty or representation under this Agreement that is not remedied within thirty (30) days of having received written notice of the breach." ASA Section 8.3, ECF No. 2-1. Nothing in Section 8.3, Defendant argues, limits a breach of contract claim to the same thirty day time period or incorporates Section 6.5's limitations. Def.'s Resp., ECF No. 62.

The resolution of this claim turns on questions of contract interpretation—whether and when Section 6.5 of the ASA controls a dispute. If a contract is unambiguous, "then its interpretation is a matter of law and there is no issue of fact to be determined." *Inland Refuse Transfer Co. v. Browning-Ferris Indus. of Ohio, Inc.*, 474 N.E.2d 271, 272 (Ohio 1984). In such a case, the contract's terms are to be given their plain and natural meaning. *Books-a-Million, Inc. v. H & N Enters.,*

*Inc.*, 140 F. Supp. 2d 846, 853 (S.D. Ohio 2001). The court should attempt to harmonize a contract's provisions and terms to give effect to every word. *Christe v. GMS Mgmt. Co.*, 705 N.E.2d 691, 693 (Ohio 1997) (citing 18 Ohio Jur. 3d (1980), Contracts, § 157); *Nature Conservancy*, 680 F.3d at 676 ("In determining a contract's plain meaning, the court is obligated to read the parts of the contract as a whole, and when possible should embrace an interpretation that promote[s] harmony between . . . provisions.") (quotation omitted).

Nothing in the plain language of Section 6.5 suggests it is limited to invoice disputes based solely on billing errors as Defendant argues. To the contrary, Section 6.5 purports to control invoice adjustments based on *anything* besides eligibility. That would include downward fee adjustments for work not performed adequately or at all. Accordingly, Defendant was required to, but did not, object to the Plaintiff's fee invoices within thirty days of their submittal.

Defendant's argument that Section 8.3 alone controls its allegations of material breach is unavailing. Section 6.5 can be read in conjunction with Section 8.3's material breach term. If a fee invoice was not calculated or submitted in accordance with the ASA and thus constituted a material breach, Defendant could both seek adjustment of the invoice under Section 6.5 within thirty days (the end of the time period covered by the invoice), and give notice of breach and impending default under Section 8.3. Defendant again attempts to read discord into two provisions that can and should be read in harmony.

Further, Defendant's allegation that Plaintiff was in material breach of the ASA, and thus Section 8.3 controls, is belied by Tibbetts' testimony that he never gave Plaintiff notice of any breach.  Tibbetts Dep. 256, ECF No. 48.  Instead, Tibbetts threatened Plaintiff that, if it did not improve its performance, he would *then* declare Plaintiff to be in breach of the ASA and seek default.  He admitted that the dispute never got that far: "[Plaintiff] came back to us and showed us a plan" to resolve the claims backlog , which Tibbetts approved. *Id.* He acknowledged that Plaintiff accomplished the plan and "cleaned it up." *Id.* Defendant never attempted to invoke Section 8.3 against Plaintiff while the ASA was in effect, and it cannot rely on it now after the fact.

In summary, Defendant was required to abide by Section 6.5 in challenging the validity or amount of Plaintiff's fee invoices.  Defendant admits that it did not do so.  Plaintiff's motion for summary judgment as to Counterclaim Count One is therefore granted.

### 2. Counterclaim Count Four: Defendant's breach of contract claim for unapproved payments

Defendant further counterclaimed against Plaintiff, alleging that Plaintiff breached the ASA "by paying $470,114.94 in claims which had not been approved or authorized by" the designated managed care partner, MMSI.  Am. Counterclaims 4, ECF No. 27.  Defendant alleged that, under the ASA, Plaintiff agreed to "pay only those claims which had been approved or authorized" by MMSI. *Id.*

Plaintiff moves for summary judgment on this counterclaim, arguing that Defendant "cannot prove that [Plaintiff] paid any claims in violation" of the ASA or

that it "sustained any damages." Pl.'s Mot. 11, ECF No. 53. In support, Plaintiff points to the report it prepared that "determined that [Defendant] would have paid all of the claims except possibly $20,000." *Id.* at 12. Plaintiff argues that Defendant has not yet investigated this report or proven that even the $20,000 was paid in error. *Id.* at 14. In other words, Plaintiff argues that Defendant suffered no damages because, even if Plaintiff had followed the proper procedure under the ASA, Defendant would have ultimately paid these claims.

Defendant responds that the mere fact that Plaintiff paid unauthorized claims establishes that Plaintiff "substantially breached the ASA," and entitles Defendant to recover the entire $470,114.94. Def.'s Resp. 9, ECF No. 62. Defendant further argues that Plaintiff has not proven its defense that the unauthorized claims "were in fact payable." *Id.*

Summary judgment is improper on this claim because there are genuine issues of material fact that must be resolved. At trial, Defendant will attempt to prove its allegations that some or all of the $470,114.94 in claims were improperly paid by Plaintiff. And Plaintiff will attempt to prove its allegations that some or all of these claims, even if paid in violation of the ASA, cannot constitute a harm to Defendant because they were nonetheless payable. Pl.'s Mot. 11–14, ECF No. 53. . At this stage, the Court cannot resolve this factual dispute. Besides, Plaintiff itself admits that, at the very least, it may have improperly paid $20,000 in claims. *See* Tibbetts Dep. 177, ECF No. 48 (testifying that Plaintiff's report admitted that $20,000

in claims should not have been paid). As a result, the Court cannot rule, as a matter of law, that Defendant could not prevail on this claim at trial.

In sum, the Court denies Plaintiff's motion for summary judgment as to Counterclaim Count Four.

## V.    CONCLUSION

For the above reasons, the Court **DENIES** Defendant's Motion, ECF No. 54, and **GRANTS IN PART AND DENIES IN PART** Plaintiff's Motion, ECF No. 53. Specifically, the Court grants summary judgment in favor of Plaintiff as to Count Four of Defendant's counterclaims and denies summary judgment in favor of either party as to all other claims and counterclaims. In addition, the Court **DENIES** Defendant's Motion to Amend, ECF No. 77.

The Court encourages the parties to engage in good faith settlement negotiations and to contact the Court should they desire a Magistrate Judge to mediate.

**IT IS SO ORDERED.**

_____/s/ Michael H. Watson_____
**MICHAEL H. WATSON, JUDGE**
**UNITED STATES DISTRICT COURT**